707 A.2d 171

RAYMOND DONOVAN, PLAINTIFF–APPELLANT, v. PORT AUTHORITY TRANS–HUDSON CORPORATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued February 10, 1998—Decided March 30, 1998.

---

Before Judges DREIER, KEEFE and WECKER.

*Francis Sorin* argued the cause for appellant (*Mr. Sorin*, on the brief).

*Sharon F. McGahee* argued the cause for respondent (*Hugh H. Welsh*, attorney; *Ms. McGahee*, on the brief).

The opinion of the court was delivered by

KEEFE, J.A.D.

The primary issues presented in this appeal are whether state or federal law governs plaintiff's prospective lost wage claim under the Federal Employers' Liability Act, 45 *U.S.C.* § 51 *et seq.* (FELA), and whether the trial court erred in barring such claim in this matter.

Plaintiff, Raymond Donovan, brought suit under the FELA against his employer, the Port Authority Trans–Hudson Corporation (PATH or defendant), for injuries sustained in the course of employment. Defendant answered the complaint and raised the defense of plaintiff's contributory negligence. Jurisdiction in the New Jersey Superior Court was under 45 *U.S.C.* § 56.

After a four day trial, the jury returned a unanimous verdict, finding that defendant was negligent, that such negligence caused plaintiff's injuries, and that defendant was therefore liable in the

amount of $250,000 for plaintiff's pain and suffering. The jury also decided that plaintiff was thirty-three percent contributorily negligent and that his award should be reduced accordingly under the FELA.

Both plaintiff and defendant moved for a new trial, and the judge denied both requests. Plaintiff appeals and defendant cross-appeals raising the following issues:

## *APPEAL*

I. PLAINTIFF'S CONTRIBUTORY NEGLIGENCE SHOULD NOT HAVE BEEN A JURY ISSUE

II. THE COURT ERRED IN NOT PERMITTING THE JURY TO CONSIDER THE IMPACT OF PLAINTIFF'S INJURIES ON HIS ABILITY TO SECURE AND MAINTAIN EMPLOYMENT

## *CROSS-APPEAL*

III. THE TRIAL COURT ERRED BY GIVING AN ADVERSE INFERENCE CHARGE TO THE JURY REGARDING PSYCHOLOGICAL EXPERTS WHO FAILED TO TESTIFY AT TRIAL

IV. PLAINTIFF'S FEAR OF LOSING HIS JOB WAS NOT A PSYCHOLOGICAL INJURY FOR WHICH HE WAS ENTITLED TO DAMAGES AND THE TRIAL COURT ERRED BY ALLOWING THE JURY TO CONSIDER SUCH EVIDENCE ESPECIALLY SINCE NO COMPETENT EXPERT TESTIMONY WAS PRESENTED REGARDING PLAINTIFF'S PSYCHOLOGICAL CONDITION

   A. Prospective Damages are not recoverable

   B. Plaintiff failed to meet the requirements to establish impaired earning capacity

   C. The jury in error based its damage award for past wage loss and future wage loss on gross income rather than net taxable income.

We are satisfied from our review of the record that none of the issues presented on the appeal or cross-appeal have merit or require extensive discussion, with the exception of that part of the appeal and cross-appeal relative to plaintiff's claim for future lost income. *R.* 2:11–3(e)(1)(E). As to that issue, we find error requiring a new trial. Because the error does not affect the liability judgment, we affirm that portion of the judgment and remand for a new trial limited to damages.

## I.

Plaintiff completed two years of high school and then obtained a G.E.D. while in the military. After his discharge from the Marines in 1969, he was engaged in labor intensive occupations requiring the use of both hands, except for one year when he was employed as a corrections officer in the Hudson County jail.

In 1985, plaintiff began working for defendant as a car repair apprentice and began a three year training period. After completing the training period, plaintiff worked for defendant as a car repairman/mechanic for five months. Plaintiff then took and passed a test to become a car-repair foreman. He earned $1,137.00 per week as a foreman.

On March 8, 1993, plaintiff was working with a fork-lift operator to clear out the contents of a warehouse that was no longer in use. Plaintiff was not meant to handle anything, but rather would mark the materials with a paint tube or spray can. Once plaintiff had marked the pallets, the forklift operator would take them to either a truck designated for stock use or to a truck that would take the scraps to be junked. In the course of his duties, plaintiff came upon two pallets stacked one on top of the other. He marked one of them, and a piece of steel that was leaning somewhat precariously fell off the palette and hit his hand, causing injury.

Plaintiff reported the injury and was driven by the forklift driver to North Hudson Hospital where x-rays were taken of plaintiff's right hand. It was discovered that plaintiff had a comminuted fracture of a bone in his hand. A doctor put the hand in a fiberglass cast up to the middle of the forearm. The next day another doctor took off the fiberglass cast, and set the hand in a plastic cast. Plaintiff continued to see the company doctor, Dr. Rosenstein, every one to two weeks, until the end of April when the cast was taken off.

After the cast came off, plaintiff felt numbness in his hand for which Dr. Rosenstein recommended that plaintiff see another doctor in his office for physical therapy. Plaintiff did so, two

times a week, until July of 1993. Even after the physical therapy, plaintiff felt numbness, pain, and discomfort, and he was unable to hold things because objects would simply fall out of his hand. After therapy, plaintiff went to see a neurologist, Dr. Larkin, who recommended that he have an operation on his hand. Dr. Rosenstein performed surgery in August of 1993, after which a cast was put onto plaintiff's hand for three weeks. After the surgery, plaintiff resumed physical therapy at Dr. Rosenstein's office.

Then, in October 1993, plaintiff underwent bone graft surgery in his hand, and a cast was again placed on his hand until November 1993. After the cast came off, plaintiff still felt a lot of pain, and he continued his physical therapy with Dr. Rosenstein until January or February of 1994. Although plaintiff did not receive therapy from Dr. Rosenstein thereafter, he did continue therapy at home.

Plaintiff was paid his wages for the time that he was out of work. When he returned to work on May 29, 1993, he worked as a car repair foreman for one week, although he was still unable to move his hand fully and was restricted from climbing, lifting and other physical activities. He testified that he was placed on "permanent restriction" by two PATH doctors. His restrictions included the requirement that he wear a splint and that he not lift, climb, or handle certain things.

In late 1995, plaintiff was taken off the restrictions, but during the course of his work his hand remained numb, and he was told to wear a splint to immobilize his hand and restrict movement. Plaintiff testified that even with the splint he was unable to do physical work because of the pain in his hand, and that when he did something "out of the ordinary" he felt shooting pains up his arm. He also testified as to the general limitations on his activities caused by his injuries.

A week after returning to work, plaintiff's job as foreman was "abolished," apparently because of a reduction in force at PATH. When defendant eliminated the position, the foremen had to re-bid for the remaining positions. Plaintiff did not get another foreman

position because the jobs were awarded on the basis of seniority, and plaintiff had less seniority than the other applicants. Plaintiff acknowledged that even though his job as a foreman was abolished, he has retained the title of foreman and has received the same pay that he used to receive when he worked as a foreman.

At one point, plaintiff testified that he did not want the foreman job anymore and would have preferred to work as a mechanic. Although plaintiff was told that he could return to work as a mechanic, he never did so. He testified that defendant continually changed its position on that issue. This insecurity caused plaintiff to suffer from stress, inasmuch as he was "restricted" from his job as a foreman or mechanic and could be terminated at any time. From June 1993 until April 1995, plaintiff was assigned a clerical type job, where he took numbers from the parts book and put them in the manufacturers books.

Plaintiff reported to the PATH medical department and told Dr. Duke that he was feeling great pressure and stress "[related] to ... the condition of [his] job at that time." Plaintiff also testified that, although he never had drinking problems before, he drank during the time he was out of work. Dr. Duke recommended that he see Dr. Seigel, a psychiatrist who worked for PATH, who, in turn, recommended that plaintiff see Dr. Maria Mastres, a psychologist. Plaintiff began seeing Dr. Mastres in September of 1993 and continued to see her a total of twenty four times until April of 1995.

In April 1995, plaintiff began his work assignment of "bar coding" the serial numbers of train components. Defendant was required by the Federal Railway Administration to keep track of all its train components and was having them bar coded so that the serial numbers could be scanned and recorded easily. When plaintiff began doing the bar code work, defendant no longer discussed whether plaintiff would return to work as a mechanic. Although this reduced the level of plaintiff's job related anxieties, plaintiff testified as to his then-state of mind:

I still don't know what my job is. I have a job bar coding which is not a job—it's not like a permanent job. Each job in that place—people who have a job they bid on a certain position. I have nothing in writing as to what my position is.... I feel that I'm going to be losing this job soon. I don't feel that I'm going to be there in a long term position. And that's basically how I fear for losing my job. They abolished it and I don't think they are going to make compensation after I get done with court to make any arrangements for me as far as a job.

## II.

Plaintiff contends that the trial judge erred in holding that plaintiff's claim for future lost wages was speculative, and, in light of that holding, in failing to permit his expert, Dr. Margolies, to testify that plaintiff's injuries would impact on his ability to secure and maintain employment with an employer other than PATH.

It is undisputed that at the time of trial plaintiff was still employed by PATH and that he was still receiving the pay of a foreman, although not performing the duties of a foreman. Rather, plaintiff's work assignment, "bar coding" the serial number of train components, is considered light duty. The duty was assigned plaintiff to accommodate his disability, but the position is a non-permanent one.

Prior to trial, defendant raised the issue of plaintiff's claim for future lost wages. Defendant's primary objection was that the claim was speculative, inasmuch as plaintiff was still employed by PATH and had not suffered any lost wages by reason of his disability. The judge agreed with defendant that plaintiff's claim was speculative under the facts of the case because "[w]e normally deal in probabilities." The judge further held that, even if he were to assume that plaintiff would probably be terminated at some point in time, there was no evidence that any witness could "quantify" the loss. He said: "The injury may be obvious, the economic effect may not be obvious and is certainly not quantifiable."

Dr. Margolies, plaintiff's rehabilitation expert, was permitted to testify without objection that plaintiff's injury has caused spasticity of the hand, weakness of grip with a decrease of gross and fine

finger movements of his dominant, right hand, and post traumatic neurosis with anxiety relative to job security. The doctor also testified that the injuries were permanent. Indeed, on cross-examination defense counsel elicited an opinion from the doctor that plaintiff would be unable to perform any of the type of work for which he had been trained and his employment history involved—heavy work. In the doctor's view, plaintiff could perform only "very, very light type of work." Notwithstanding this testimony, Dr. Margolies was prevented from offering his opinion "as to what Mr. Donovan's prospects are out in the job market should he not have the light job PATH ... is presently having [him] work with[.]"

Accordingly, in the absence of any testimony on the issue of plaintiff's prospective lost wages, the trial judge specifically instructed the jury that it could not award damages to plaintiff for future lost wages and could consider plaintiff's anxiety over job security only in terms of its impact on any verdict it may award for pain and suffering.

### III.

In their appellate briefs, the parties debate whether plaintiff's proffer of proof on the issue of future lost wages satisfied New Jersey substantive law. The debate is irrelevant to the determination of whether error was committed in this case. That is so because "[i]n FELA cases brought in the state courts, the rights and obligations of the parties are governed by the act, 45 *U.S.C.A.* §§ 51 to 60, and by federal principles of common law." *See Pelliccioni v. Schuyler Packing Co.*, 140 *N.J.Super.* 190, 193, 356 *A.2d* 4 (App.Div.1976) (citing *Chesapeake & Ohio Ry. Co. v. Kuhn*, 284 *U.S.* 44, 46–47, 52 *S.Ct.* 45, 45–46, 76 *L.Ed.* 157 (1931)); *see Norfolk & Western Ry. Co. v. Liepelt*, 444 *U.S.* 490, 493, 100 *S.Ct.* 755, 757, 62 *L.Ed.2d* 689, 693 ("It has long been settled that questions concerning the measure of damages in a FELA action are federal in character") (citation omitted), *reh'g denied,* 445 *U.S.* 972, 100 *S.Ct.* 1667, 64 *L.Ed.2d* 250 (1980); *Genovese v. New*

*Jersey Transit Rail Operations,* 234 *N.J.Super.* 375, 378–79, 560 *A.*2d 1272 (App.Div.1989) (distinguishing the procedural application of evidence rules from "measuring damages, which in FELA cases is governed by substantive federal law") (citing *St. Louis Southwestern Ry. Co. v. Dickerson,* 470 *U.S.* 409, 410, 105 *S.Ct.* 1347, 1347–48, 84 *L.Ed.*2d 303 (1985)); *Foote v. Erie Lackawanna Ry. Co.,* 142 *N.J.Super.* 195, 200–01, 361 *A.*2d 62 (App.Div.1976).[1]

■ A plaintiff's right under the FELA to recover damages for his inability to secure the type of work he was performing before the accident from another employer because of the injuries for which defendant is liable is well established in federal law. Indeed, even where, as here, the plaintiff is still employed by the defendant and has not suffered lost wages, a claim for future lost wages is allowed where there is proof that the employee's "economic horizons have been limited by his injury." *Wiles v. New York, Chicago & St. Louis R.R. Co.,* 283 *F.*2d 328, 331–32 (3d Cir.1960), *cert. denied,* 364 *U.S.* 900, 81 *S.Ct.* 232, 5 *L.Ed.*2d 193 (1960). Further, a claim for such future loss is not considered speculative under federal law.

> [W]e cannot say that there was a significantly larger element of speculation in arriving at an estimate of Wiles' loss of future earnings than there would be in any ordinary instance requiring an estimate of damages by a jury. Since none of us is capable of foreseeing the future with any substantial degree of certainty every estimate of damages must contain elements of speculation.
>
> *Id.* at 332.

The fact that plaintiff remained employed in a higher paying position, whether under those circumstances plaintiff was likely to look elsewhere for employment, and whether there was any real likelihood that the employer would terminate plaintiff under the circumstances are simply factors for the jury to consider in determining whether such damages should be awarded. *Ibid.*

---

[1] *But see Dombrowski v. City of Atlantic City,* 308 *N.J.Super.* 459, 706 A.2d 242 (App.Div.1998), which suggests that the type of proofs offered in this case would be insufficient to meet the requirements of *Coll v. Sherry,* 29 *N.J.* 166, 148 A.2d 481 (1959).

■ A FELA plaintiff, therefore, need not prove more probably than not that he will earn less money in the near future. "Rather, a plaintiff must show that his injury has caused a diminution in his ability to earn a living. Such a diminution includes a decreased ability to weather adverse economic circumstances, such as a discharge or lay-off, or to voluntarily leave the defendant employer for other employment." *Gorniak v. National R.R. Passenger Corp.*, 889 *F.*2d 481, 484 (3d Cir.1989).

In *Gorniak*, a plaintiff who worked in a physical capacity sustained shoulder injuries and sued under FELA. The plaintiff produced two orthopedic surgeons who testified as to plaintiff's limitations in engaging in work similar to that performed prior to his accident. The court wrote:

> Under the standard articulated in *Wiles*, it is apparent that the district court did not err in allowing Gorniak's lost earning capacity claim to go to the jury. Expert testimony indicated that Gorniak was subject to permanent physical restrictions, restrictions that would preclude him from working as a materials handler or store attendant in an Amtrack warehouse, and in many positions in the industrial workforce outside Amtrack. This makes Gorniak's case considerably stronger than Wiles', since Wiles had no permanent physical restrictions precluding him from even heavy industrial employment. And though Gorniak was fairly senior in his union, he had been bumped from his post-injury position as a ticket clerk to another light-duty job by a worker with greater seniority. If he were bumped to a position as a materials handler, Gorniak testified that he would have to leave Amtrack's employ since such a position was beyond his physical capacity. While Amtrak argues it is unlikely that Gorniak will lose his light-duty job, it has not guaranteed Gorniak that such a position will be available within reach of his home.... Indeed, evidence at trial indicates that Amtrak has closed one of its Pennsylvania facilities and has abolished jobs in plaintiff's craft at another during Gorniak's employment with Amtrak. Moreover, even if such a position were made permanently available to Gorniak, Gorniak could still recover since he is under no obligation to remain with Amtrack, and the fact that his injuries hindered his ability to obtain other employment if he wished was one the jury could consider in deciding to award him damages.

> [*Gorniak, supra,* 889 *F.*2d at 484.]

■ The *Gorniak* case is comparable to the case before us in numerous respects. Plaintiff, like the plaintiff in *Gorniak*, is in a position where, although the defendant employer has made provisions for plaintiff to continue his employment, should the relationship be terminated the plaintiff is physically unable to return to

the work he did before the accident. Further, in both cases there was evidence that the defendant employer is in the midst of downsizing. Therefore, plaintiff has valid support for the claim that he is entitled to recover damages for future lost wages under FELA even though his employment with defendant has not terminated and an award would be based, to a degree, on speculation. *See ibid.*

The principles expressed in *Wiles* and *Gorniak* were recently embraced by the court in *Fashauer v. New Jersey Transit Rail Operations, Inc.*, 57 *F.*3d 1269 (3d Cir.1995). Indeed, the court expressed the view that plaintiff need not call a vocational expert to establish the claim. *Id.* at 1284. The *Fashauer* court, nonetheless, rejected plaintiff's claim because his medical experts' testimony was "only tangentially related to Fashauer's economic horizons." *Ibid.* Here, plaintiff's attempt to offer testimony from a rehabilitation expert as to the impact plaintiff's injuries would have on employability in the future was rejected. Thus, defendant's reliance on *Fashauer* to support its position in this case is distinguishable on the facts. We cannot say that Dr. Margolies' testimony was insufficient to establish plaintiff's claim when it was defendant who blocked testimony on the issue.[2]

We, of course, are not bound by decisional law of the Third Circuit. *Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 79–80, 577 *A.*2d 1239 (1990). In that vein, we recognize *DeChico v. Metro–North Commuter R.R.*, 758 *F.*2d 856 (2d Cir.1985), which affirmed the district court's refusal to allow a jury to consider a FELA plaintiff's lost earning capacity claim on the ground that it

---

[2] We note that defendant has argued in its appellate brief that Dr. Margolies did not have the qualifications to testify on this issue. That was not, however, the basis for defendant's objection in the trial court. Dr. Margolies was permitted to testify as an expert in the field of vocational rehabilitation. The testimony now in question was excluded on substantive, not evidential grounds.

It would have been better practice, and more helpful to this court, had the parties placed Dr. Margolies proposed testimony on the record out of the presence of the jury. *R.* 1:7–3. In that way we could have determined whether the error in excluding it was, nonetheless, harmless. *R.* 2:10–2.

was too speculative. The *DeChico* court, however, did not disapprove of the Third Circuit's holding in *Wiles, supra.* 758 *F*.2d at 861. Rather, it distinguished *Wiles* from the case before it on the facts. In *DeChico,* the court emphasized that plaintiff returned to the same position that he held prior to his injury and was also earning a higher wage. Further, and perhaps most importantly, at trial plaintiff testified that he expected to continue with his current employer in another capacity if he lost his current position, and that the thought of starting his own business was just a "dream." *Ibid.*

We have found no federal case law interpreting the FELA that has questioned the Third Circuit's holdings concerning the substantive law governing a FELA plaintiff's future lost wage claim. Where the federal courts are in accord with respect to a subject regarding the interpretation of a federal statute, their decisions should be accorded "due respect" on principles of comity. *Dewey, supra,* 121 *N.J.* at 80, 577 *A*.2d 1239. "By helping to ensure uniformity, judicial comity discourages forum shopping." *Ibid.* Accordingly, we hold that the principles announced in *Wiles, Gorniak* and *Fashauer* are applicable to this case and binding on the trial court on remand.

■ With respect to this same issue, plaintiff attempted to prove that his anxiety over the uncertainty of his continued employment with PATH was realistic by proffering proof that three other PATH employees had been terminated shortly after their FELA litigation against PATH had ended. The judge explained his decision as follows:

> I have a problem to the extent that these cases are based on hearsay. I don't know that [plaintiff] is competent to testify to them. I don't think that we should try this case on the basis of the merits of three different cases, which we cannot relitigate.... There's no way this jury could consider those cases without developing deep prejudice against [defendant] on the assumption that they mistreat their employees. I can't allow that. The prejudicial effect would far outweigh any, if any, evidential value. That is my ruling on this point.

This evidentiary decision was based on *N.J.R.E.* 403 and was discretionary in nature. *See N.J.R.E.* 403 ("[R]elevant evidence

may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, ... "). The concept had apparently not been thoroughly developed through pre-trial discovery. Thus, the offer of proof was a bare allegation that would require the development of proof at trial leading in a somewhat unpredictable direction. The judge did not abuse his discretion in refusing to allow, in essence, three additional mini-trials in plaintiff's case to prove the allegation that defendant has a policy of terminating employment in bad faith after concluding litigation with injured employee-plaintiffs.[3]

Defendant charges error with regard to the jury having returned a verdict based on gross earnings and not on net earnings. Nevertheless, as plaintiff correctly pointed out, the jury was instructed that the question of lost earnings was not before them. Defendant withdrew the issue at oral argument before us.

Because the issue is not now before us, we have made no effort to exhaustively explore this field. Nonetheless, on remand, we commend to the trial court and the parties the discussion of related measure of damage issues in the cases of *Norfolk & Western, supra*, 444 *U.S.* at 493–94, 100 *S.Ct.* at 757, 62 *L.Ed.2d* at 693–94 (explaining that in an action brought under FELA, "[i]t is [the plaintiff's] after-tax income, rather than his gross income before taxes, that provides the only realistic measure of [the plaintiff's] ability to support his family"), and *Gorniak, supra*, 889 *F.2d* at 484–87 (holding that the plaintiff has burden of producing evidence permitting a rational reduction of future wage loss damages to present value).

The error with respect to the issue of future wage loss requires a remand for a new trial on all issues related to damages. We recognize that the jury verdict of $250,000 was ostensibly limited

---

[3] We do not preclude plaintiff from pursuing this issue further on remand by competent evidence sufficient to establish a genuine fact issue as to such a "policy." If, however, plaintiff intends to pursue the issue, the trial court should pass on the question after conducting a *N.J.R.E.* 104 hearing.

to plaintiff's pain and suffering without reference to potential lost earnings. Nonetheless, we also recognize that a component of that award was plaintiff's anxiety over the uncertainty of his job security with PATH, a condition that was anticipated to last beyond the conclusion of the trial. The inclusion of the future wage claim in the new trial may have some impact on the anxiety component of the personal injury award. Thus, all damage issues must be re-tried.

We have found no error that warrants a new trial on the issue of liability. Therefore, the judgment on the issue of liability is affirmed.

Affirmed in part, reversed in part, and remanded for a new trial limited to damages.

707 A.2d 178

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LAURENCE GERTRUDE, DEFENDANT–
APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted March 18, 1998—Decided March 30, 1998.

Before Judges KING and KESTIN.

> no evidence of any policy of compulsion. Collazo was represented by counsel and neither defendant nor his attorney objected. Further, defense counsel was satisfied that defendant's appearance in prison garb was supportive of defense trial strategy. The attorney also represented to the trial court his client's awareness of the situation. Contrary to the motion judge's conclusion, the trial judge was not under then existing law obligated to make any inquiry of the defendant personally, nor was the State required to bear the burden of showing a voluntary waiver. Further, any error is rendered harmless in light of the trial judge's *voir dire* and instruction to the jury.